**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| OSMENT MODELS, INC, ) <br> ) <br> and ) <br> ) <br> O CO. ) <br> ) <br>       Plaintiffs, ) <br> ) <br>   vs. ) <br> ) <br> MIKE'S TRAIN HOUSE, INC. ) <br> ) <br>       Defendant. ) | Case No. 2:09-CV-04189-NKL |

**ORDER**

Plaintiffs Osment Models, Inc., and O Co. ("Plaintiffs") and Defendant Mike's Train House, Inc. ("Mike's"), are companies engaged in the model railroad industry. Plaintiffs have sued Mike's for copyright infringement, false advertising, and unfair competition as to three of its copyrighted models. Before the Court is Mike's' Motion for Summary Judgment. [Doc. # 161]. For the following reasons, Mike's' Motion is DENIED.

**I.   Factual Background**[1]

Plaintiff Osment Models, Inc,. is in the business of selling model railroad accessories and buildings. Plaintiff O Co. is a holding company that owns certain copyrights and other

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence. In considering each party's motion, the Court has drawn all inferences in favor of the non-movant.

1

intellectual property. Plaintiffs previously acquired Mr. Robert Lunde's model business, which included a train depot model and photographs of the actual station, located in Jefferson, Colorado ("Jefferson Station"), upon which Mr. Lunde based the model. [Doc. # 177, ¶¶ 19-20]. Plaintiffs own copyrights as to three models at issue in this case: the "Fill 'Er Up & Fix 'Er" gas station ("gas station model"), and the Dansbury Depot and Coal River Depot. [Def. Exs. ## 9, 10, 11]. The train depot models are substantially similar to each other such that the initial copyright registration certificate for the Dansbury Depot identified the Coal River Depot as a prior registration. [Doc. # 214, ¶ 8]. Throughout the stages of litigation, both parties have often referred to the train depot models as a single model.

Defendant Mike's Train House, Inc., sells model railroad products. [Doc. # 177, ¶¶ 1-2]. In particular, Mike's sells a model gas station and a model train depot, which Plaintiffs claim infringe on their copyrighted models. Plaintiffs also assert claims of copyright infringement, unfair competition, and false advertisement due to Mike's' use of photographs of Plaintiffs' models in its sales catalog.

The copyright registration certificates as to each of Plaintiffs' models do not state that they were based on real-life buildings in the section entitled "Derivative Work or Compilation," which requires a copyright applicant to identify any preexisting work that its work "is based on or incorporates." [Def. Exs. ## 9, 10, 11]. The certificates also do not acknowledge Mr. Lunde as an author of the Coal River Depot. *Id.* Not until June 2010 were Plaintiffs aware that Mr. Lunde referenced the Jefferson Station when making his scratch-

built model, which was in turn used to create Plaintiffs' depot design. On June 14, 2010, Plaintiffs filed a supplemental registration for the Coal River Depot indicating, among other things, that Mr. Robert Lunde was an author of the model. It did not list the Jefferson Station as a pre-existing work. [Docs. # 177, ¶¶ 18-19; # 214-21]. Subsequently, Plaintiffs became aware of the extent to which Mr. Lunde had photographed and measured the Jefferson Station, [Doc. # 177, ¶ 20], and submitted an application in September 2010 for a supplementary registration of Coal River to the Copyright Office, identifying the Jefferson Station as a preexisting work. [Doc. # 214, ¶ 8].

Model railroaders demand that model buildings replicate reality and manufacturers strive to do that in creating their models. [Doc. # 177, ¶ 6]. The founder of Plaintiffs' companies stated that it is important for Plaintiffs' business that their model buildings look realistic. *Id.* Plaintiffs simulate real life in their models and make models that are as close to reality as possible. [Doc. # 177, ¶ 9]. To do so, Plaintiffs' usual practice is to use images of real buildings in the public domain found in publications, historical sources, and the internet to make and sell model buildings that are modeled after those real buildings. [Doc. # 177, ¶¶ 8, 11]. Plaintiffs do not replicate actual buildings, but rather browse depictions of real buildings to get an idea of the type of building they want to create and then make up a combination of details and architectural elements to make the model more artistic and unique; they base their models on a time period and go to great lengths to get the signage and details correct. [Doc. # 214, ¶¶ 4-6]. Plaintiffs advertise that their model buildings are "great

3

for modelers who want realistic structures with architecturally correct details" and are "architecturally accurate models that have been specifically researched and developed for the model railroading industry." [Doc. # 177, ¶ 13].

The process by which a model builder creates a model involves "reducing the real building by a scale factor" and "selective compression," which involves applying artistic impression to hold the look of a building, yet compress it to fit a model train layout. [Docs. # 177, ¶ 7; # 214, ¶ 3]. Enlarging a model building to the size of a real building would often yield absurd results. [Doc. # 214, ¶ 3 ("[Y]ou'd go walk inside of it and the furniture would have to be painted on the wall. You couldn't even turn around.") (citing Pltfs.' Ex. 3, at 61:6-10)].

The Jefferson Station was built around 1880. Though historic, it is not unique, as the station presents all of the standardized elements typically found in a depot built in the late 1800s, and other train depots similar to it have been observed. [Doc. # 177, ¶ 21]. Images of the Jefferson Station appear in numerous historical and architectural documents and books, including the June 1997 issue of *Model Railroader*, a magazine that Plaintiffs receive and review. Additionally, prior to Plaintiffs' introduction of their train depot to the market in 1999, other companies had advertised, displayed, and sold replicas of the Jefferson Station in model railroad magazines that Plaintiffs received. [Doc. # 177, ¶ 22]. Plaintiffs' model, however, differs from both the third-party models and the Jefferson Station in at least twenty-one ways, including having a raised platform, three-color paint scheme, and different types

4

of framing rails around the window casings. [Doc. # 214, ¶¶ 11-12]. Although there are at least twenty-one uncontested differences between Plaintiffs' train depot model and Mike's, [Docs. # 177, ¶ 32; # 214, ¶ 18], several of their similarities include aspects of how Plaintiffs' model differed from the Jefferson Station and other third-party models. [Doc. # 214, ¶ 21].

Plaintiffs do not know the specific buildings or materials that they consulted in designing the gas station model because the employees involved in the design have left the company and are not available. [Doc. # 177, ¶ 37]. None of the photographs, pictures, and other depictions of gas stations from Plaintiffs' research and development files, which may have been referenced in the design process, are substantially similar to Plaintiffs' gas station. [Doc. # 214, ¶¶ 23, 25]. Plaintiffs employed their usual practice for creating new models. [Doc. # 177, ¶ 38; # 214, ¶ 24]. Mike's experts concluded that Plaintiffs' gas station is "likely" based on an actual, real-life building because its design is typical of gas stations from the 1920s and 1930s. [Doc. # 177, ¶¶ 39-44]. Plaintiffs contest this assertion. Although there are over twenty uncontested differences between Plaintiffs' gas station model and Mike's, [Docs. # 177, ¶ 48; # 214, ¶ 28], they are also similar in over twenty other uncontested aspects. [Doc. # 214, ¶ 31].

Mike's President, Mr. Michael Wolf, testified that photographs of Plaintiffs' depot and gas station were used in Mike's' catalog before Mike's had produced its own models. [Doc. # 214, ¶¶ 22, 32]. The photographs of Plaintiffs' depot and gas station may have been

5

modified, but they did not reflect any changes to the structure of Plaintiffs' models. [Doc. # 177, ¶¶ 36, 52; # 214, ¶¶ 22, 32].

Plaintiffs seek actual damages (including lost profits and damage to Plaintiffs' reputation and goodwill) and Mike's profits as a result of its acts of alleged copyright infringement, false advertising, and unfair competition. [Doc. # 214, ¶ 33]. Plaintiffs' reputation became impaired when Defendant marketed its inferior products–that look like Plaintiffs' products–and postings on internet blogs began to question the relationship between Plaintiffs and Mike's. [Doc. # 214, ¶ 35]. Plaintiffs specifically seek $260,000 for this reputational damage, [Doc. # 177, ¶ 57], which is based on 2% of Plaintiffs' 2009 annual revenue. [Doc # 177, at 14]. Plaintiffs frequently used the "2% rule" to assess public response, such as to calculate how many tradeshow attendees would purchase product at a particular show and to determine an expected response rate to a mass mailing for marketing purposes. [Doc. # 177, ¶ 58; # 214, ¶ 35].

## II.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

## III. Discussion

Mike's Motion for Summary Judgment as to Plaintiffs' copyright infringement claims are based on the invalidity of Plaintiff's copyrights, either due to fraud on the Copyright Office at the time of application, or the lack of originality of Plaintiffs' models. Alternatively, Mike's argues that any copyright Plaintiffs possess is necessarily "thin," and thus protection is extended only in cases of "virtual identity," which they argue is not present here.

### A. Validity of Plaintiffs' Certificates of Copyright Registration for the Purpose of Commencing an Infringement Action

Copyright registration is a condition precedent for the commencement of a copyright infringement action. 17 U.S.C. § 411(a). Registration certificates constitute prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c). "A certificate of copyright registration, therefore, shifts to the defendant the burden to prove the invalidity of the

7

plaintiff's copyrights." *Entm't Research Grp., Inc. v. Genesis Creative Grp.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (citation omitted).

Here, Plaintiffs have presented copies of certificates of copyright registration as to all of the models at issue in this litigation. [Def. Exs. ## 9, 10, 11]. Mike's, however, contends that Plaintiffs defrauded the Copyright Office by "deliberately failing to disclose" that their models are derivatives of works in the public domain. *See Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989) (citations omitted) (proof of deliberate misrepresentation has been held to overcome this presumption); *Mon Cheri Bridals, Inc. v. Wen Wu*, 383 Fed. Appx. 228, 232 (3d Cir. 2010) ("Fraud on the Copyright Office is an affirmative defense to claims of copyright infringement. To establish this defense, a defendant must show that in applying for the copyright at issue the applicant knowingly or intentionally failed to disclose a material fact."). Namely, Mike's states that the train depots are "replica[s] of the Jefferson Station," [Doc. # 177, at 8], the gas station is also "based on [a] real life building[]," [Doc. # 177, at iv, 12], and that this information was "intentionally omitted." [Doc. # 225, at 2].

The evidence Mike's points to in support of its assertions as to the train depots include (1) Plaintiffs' nondisclosure in its initial registrations, (2) testimony by one of the creators of the train depot models, Mr. Robert Lunde, that he based the train depot on the Jefferson Station, (3) images of the Jefferson Station appear in numerous historical and architectural documents and books, (4) that prior to the publication of Plaintiffs' models, the Jefferson

8

Station was featured in the June 1997 issue of *Model Railroader*, which Plaintiffs receive and review, and (5) third-party models of the Jefferson Station existed at the time Plaintiffs released their model. [Doc. # 177, ¶¶ 18-20, 22, 26]. However, none of this evidence is dispositive of whether Plaintiffs intentionally or knowingly filed its initial registrations without reference to the Jefferson Station. Mike's fails to indicate how Mr. Lunde's knowledge that he based his model on the Jefferson Station implies that Plaintiffs, subsequent owner of Mr. Lunde's company and work, not only knew that information at the time it filed its registrations, but also intentionally omitted that information. Plaintiffs assert to the contrary that when it developed the train depots using the scratch-built model that Mr. Lunde created, it was not aware of the connection to the actual Jefferson Station. [Doc. # 214, ¶ 11]. Mike's also points to evidence of many surrounding facts–images of the Jefferson Station in texts that Plaintiffs review, other company's models of the Jefferson Station on the market, and Plaintiffs' desire to "simulate real life" in its models [Doc. # 214, ¶ 4]. The Court also notes that even after Plaintiffs discovered that Mr. Lunde referenced the Jefferson Station when building the scratch-built model Plaintiffs subsequently developed into the Coal River Depot, it did not include in its June 2010 supplemental registration application that the Jefferson Station was a pre-existing work because it was unaware of the extent to which Mr. Lunde based his model on the Jefferson Station. None of this evidence, however, shows as a matter of law that Osment knowingly or intentionally failed to advise the Copyright Office that its train depot models were based on Jefferson Station. This

9

remains an issue of fact that cannot be resolved on a motion for summary judgment.

The evidence Mike's points to in support of its assertions as to the gas station include Plaintiffs' nondisclosure in its initial registration [Doc. # 177, ¶ 18], (2) the photographs, pictures, and other depictions of gas stations that were used in Plaintiffs' research and development of the model that may have been referenced in the design process [Doc. # 214, ¶ 23], (3) disputed expert testimony that Plaintiffs' gas station model is "likely based on an actual, real-life building" [Docs. # 177, ¶ 39; # 214, ¶ 25], (4) expert testimony that Plaintiffs' gas station model is a realistic 1930s era gas station [Doc. # 177, ¶¶ 40-44]. Plaintiffs and Mike's dispute how Plaintiffs' research and development impacts the creation of a model [Doc. # 214, ¶ 14]: as a search for images upon which models will be copied, or a search for inspiration to create models. Specifically, Plaintiffs maintain that their gas station model is not based on a real-life building. [Doc. # 214, ¶ 25]. In support, they assert that their model is not substantially similar to any single image of real gas stations in its development files, which Mike's does not contest. Thus, whether Plaintiffs' gas station is based on an actual gas station such that it would require disclosure on a registration certificate and whether Plaintiffs' omission of this information was intentional remain issues of fact for a jury to decide.

Mike's appears to argue that mere failure to disclose whether an author used a pre-existing work as the basis for his work invalidates a certificate of registration. [Doc. # 177, at 7-8]. The cases cited to by Mike's, however, do not support this proposition, nor has the

10

Court found other support for Mike's argument. *See, e.g.*, *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir. 1980) (examining the limitation of the protection afforded by 17 U.S.C. § 103 to derivative works insofar that such protection does not affect the scope of copyright protection in an underlying work); *Garner v. Sawgrass Mills Ltd. P'ship*, 35 U.S.P.Q.2d 1396, 1404 (D. Minn. 1994) (granting summary judgment in favor of defendant because of plaintiff's knowing failure to disclose a preexisting work to the copyright office); *GB Marketing USA, Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 774 (W.D.N.Y. 1991) ("[T]he fact that a derivative design is not registered as such does not automatically invalidate the registration. The determinative factor is whether the omission occurred knowingly.") (citation omitted). *See also Mon Cheri Bridals*, 383 Fed. Appx. at 232 ("The omission [in the copyright application] must be intentional.").

### B.  Originality

Originality is a prerequisite for copyright protection. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 351-52 (1991). Even when a work is based on another, "[n]o matter how poor artistically the author's addition, it is [original] if it be his own." *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 103 (2d Cir. 1951) (citation omitted); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A.*, 528 F.3d 1258, 1263 (10th Cir. 2008) (citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903)). Originality requires both independent creation and minimal creativity. *Feist*, 499 U.S. 340, 345 (1991). Copyright protection for derivative works covers only those elements that are original to the

11

authors of those works. *See, e.g.*, *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993). A copyright registration certificate is prima facie evidence of the originality of the registered work. *Nimmer on Copyright* § 13.01[A], at 13-7.

Some courts have articulated how these standards apply to models. For example, in *Meshwerks*, the Tenth Circuit Court of Appeals found that Meshwerk's models of Toyota's vehicles were "copies" and not independent creations. *Meshwerks*, 528 F.3d at 1264. There, Meshwerks created digital images of Toyota's vehicles by taking meticulous measurements of the cars and mapping them onto a computerized grid. Modeling software converted these data points into a "wire frame" of each vehicle. Mehswerks' employees later "'sculpted' . . . the lines on the screen to resemble each vehicle as closely as possible." *Id.* at 1260. The task took between eighty to one hundred hours of work per vehicle due to the difficulty of portraying a three-dimensional car as a two-dimensional image. The end results of this labor were "utterly undadorned" digital models that lacked color and shading among other details. *Id.* at 1261. "Key" to the court's decision was "the fact that Meshwerks' digital wire-frame computer models depict Toyota's vehicles without any individualizing features: they are untouched by a digital paintbrush; they are not depicted in front of a palm tree, whizzing down the open road, or climbing up a mountainside." *Id.* at 1265. Devoid of such individualization, the court concluded that there was no copyrightable matter for Meshwerks.

Here, Plaintiffs own copyright registrations as to all of the models at issue in this case. Mike's attempts to rebut the statutory presumption of originality, by alleging that Plaintiffs'

models are "scale[d] down . . . size[s] of real-life buildings using an industry-standard mathematical formula," Plaintiffs' train depot models are based on the Jefferson Station, Plaintiffs changes to the structure of its model as compared to the original Jefferson Station are minor and trivial, and Plaintiffs "cannot show that they added any elements to the structure of the real-life [gas] station that was copied." [Doc. # 177, at 5, 6, 11]. At the summary judgment stage, the evidence must show that there are no issues of fact that Plaintiffs' models are not "independent creations" nor convey "minimal creativity" for the models to be deemed not original.

The record, however, does not support such a finding as a matter of law. As to the gas station model, it remains a question of fact whether Plaintiffs based its model on a pre-existing gas station. Even Mike's expert could testify only that Plaintiffs "likely" based its model on an actual real-life building. [Doc. # 177, ¶ 39]. As to Plaintiffs' train depot models, they are admittedly based on the Jefferson Station. [Doc. # 177, ¶¶ 19-20]. However, to be deemed not original, the record must further show that the models are not independent creations nor convey minimal creativity. Unlike the modeling in *Meshwerks* where modelers took detailed measurements of the real-life cars and painstakingly converted them to a digital two-dimensional format, Plaintiffs did not simply "copy" Jefferson Station into a different medium. Rather, expert testimony shows that Plaintiffs' modelers engaged in "selective compression" as opposed to merely scaling down measurements of the actual building. Further, in *Meshwerks*, the court had emphasized that the vehicle models exhibited

13

no copyrightable expression. Here, there are visual differences between Plaintiff's train depots and the Jefferson Station. Whether these differences amount to original expression remains a question of fact.

Mike's argues that the differences are "minor and trivial." [Doc. # 177, at 6]. The primary case it cites to for support of a standard by which this Court can gauge the triviality of Plaintiffs' differences is *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486 (2d Cir. 1976). That case dealt with an "Uncle Sam bank" that has been in the public domain for decades. Appellant obtained a copyright registration for a plastic version of that bank, which admittedly had been based on a non-copyrighted cast iron version of the bank. The Court of Appeals for the Second Circuit noted that the lower court found that appellants' plastic version "'reproduces' the cast iron bank 'except that it proportionately reduces the height from approximately eleven inches to approximately nine inches with trivial variations." *Id.* at 489. The Court of Appeals found that the only other differences between the two banks, aside from size and material, included the "minor" changes to the shape of the satchel and leaves. *Id.* at 489.

Here, unlike the court in *Batlin*, the Court does not find as a matter of law that Plaintiffs' specific design elements, which they contend are unique to its models, are trivial. Rather, based on the images of Jefferson Station and Plaintiffs' models presented to the Court, [Def. Exs. # 16, at 3-5; # 17, at 3; # 28; Doc. # 214-24, at 9-16], the Court notes ostensible visual differences in the setting of the depots, color scheme, signage, bracket

14

design, number of chimneys, window frame design, and back-of-the-building door and awning design. These differences, combined with selective compression, exceed the "copying" in *Meshworks* and the "trivial" modifications in *Batlin*. Unlike the car models in *Meshworks* and the plastic bank in *Batlin*, Plaintiffs' models do not appear to be mere replications of other objects in a different medium. Thus, it remains a question of fact whether Plaintiff's model is sufficiently original and therefore copyrightable.

As to Plaintiffs' gas station model, Plaintiff's point to the fact that its model is not substantially similar to any real-life building or any photos found in its research file, and maintains that it is a completely original work. Mike's has not shown as a matter of law that it is, thus whether the entire model is copyrightable remains a question of fact.

### C. "Thin" Copyrights and Protectable Elements

Mike's contends that if Plaintiffs' works are copyrightable, then Plaintiffs can monopolize public domain work and derivative works therefrom. However, its concern is misplaced. Copyright law specifically permits protection of "derivative works" as to those specific elements that are original to the authors of the derivative works. Thus, that Plaintiffs' works may be copyrightable does not mean that Plaintiffs own copyright to Jefferson Station itself, for example. Rather, Plaintiffs copyright protection would extend only to elements that are original to them. The differences noted between Jefferson Station and Plaintiffs' train depot models in Part III.B, for example, may be eligible for protection. Because the scope of originality for all of Plaintiffs' models remain a question of fact, *see*

15

Part III.B, so, too, is the determination of the models' protectable elements.

Even if Plaintiffs' works are protected, however, Mike's argues that instead of the generally applied standard for determining whether a copyright has been infringed–"substantial similarity"–a heightened standard such as "supersubstantial similarity" or "virtual identity" ought to be applied. Mike's contends that the numerous uncontested differences between Plaintiffs' models and its models support a finding that as a matter of law, Mike's did not infringe on Plaintiffs' copyrights because there exists no "virtual identity" between their models.

Several courts appear to apply this heightened similarity standard to cases concerning "thin" copyrights. That is, copyrights that have a scope of protection so narrow that they only protect from virtually identical copying by an alleged infringer. *See e.g.*, *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003). The rationale for this principle is long-established: "The less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (Learned Hand, J.).

That Plaintiffs' copyrights may offer protection only to select original elements does not necessarily render Plaintiffs' copyrights subject to a "supersubstantial similarity" or "virtual identity" test as a matter of law for three reasons. First, the scope of Plaintiffs' copyrights remain a question of fact. Despite the numerous differences between Mike's' and Plaintiffs' models, there are also numerous similarities. The scope of Plaintiffs' copyrights

16

will determine whether any of these similarities are protected original elements of Plaintiffs' models. Second, what appears to be an enhanced standard for "thin" copyrights is nothing more than shorthand terminology for the general "substantially similar" test when the scope of protection afforded by a copyright is minimal. *See e.g.*, *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (finding that the similarities between the photographs of the alleged infringer's and those of Ets-Hokin's were "inevitable" because they shared the same idea of photographing a vodka bottle, and after removing all of the uncopyrightable elements, the only protection that remained for Ets-Hokin was that from "virtual identity."). Third, the Eighth Circuit Court of Appeals applied a "substantially similar" standard to the works at issue in *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726 (8th Cir. 2002), even after determining that the work in question only possessed "thin" protection. *Id.* at 729, 731. Thus, it is inappropriate for the Court to apply at this juncture a "supersubstantially similar" or "virtual identity" standard when the scope of Plaintiffs' copyrights remain a factual issue.

**C.  False Advertising and Unfair Competition**

"The use of another's product [photographs], misbranded to appear as that of a competitor, has been repeatedly found to be 'a false designation of origin' actionable under § 43(a) [of the Lanham Act, 15 U.S.C. § 1125(a)]." *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1216 (8th Cir. 1976). Mike's President, Mr. Michael Wolf, testified that the photographs appearing in Mike's' catalogs were indeed of Plaintiffs' train depot and gas station with some "modifications." [Doc. #214, ¶¶ 22, 32]. Mike's bald assertion that its

17

photographs are "dissimilar" to Plaintiffs' train depot and gas station does not change the fact that the photographs are in fact photographs of Plaintiffs' models. The Court is aware of no law, nor has Mike's pointed to any, to support the proposition that as a matter of law, the Lanham Act is not violated if alterations are made to another's product photographs before appropriating them. Summary judgment as to this issue is denied.

### D. Monetary Relief

As explained in the foregoing, Mike's is not entitled to summary judgment on any of Plaintiffs' claims. Further, the Court has permitted the expert testimony of Mr. Shawn Fox [Doc. # 238], which Plaintiffs assert supports its damages claims. Mike's arguments targeting the credibility of Mr. Fox's damages calculations are more appropriate before a jury.

As to Plaintiffs' claim for reputational damages under the Lanham Act, there is sufficient evidence for Plaintiffs to move forward with their Lanham Act claim. *See* Part III.C. Further, based on the record, Plaintiffs have made a "submissible case" for reputational damages. *Marvin Lumber & Cedar Co. v. PPG Indus.*, 401 F.3d 901, 914 (8th Cir. 2005). At a minimum, Plaintiffs must be able to present evidence supporting the impairment of its reputation. *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109 (8th Cir. 1999) (upholding jury verdict amount for Lanham Act violation based on sufficiency of evidence of loss of goodwill). Evidence of Plaintiffs' reputational damage includes commentary on internet blogs that there might exist a relationship between Plaintiffs and Mike's. That this commentary is evidence of reputational damage is rooted in Plaintiffs' assertion that Mike's

products are inferior to its own, [Doc. #214, ¶ 35; Doc. #214-28, at 60:19-23], which Mike's does not specifically contest. At a minimum, this is a jury question. Plaintiffs' basis of their loss calculation on a company rule of thumb–that conservatively accounts for public response–also creates a submissible case to a jury. *Marvin Lumber*, 401 F.3d at 913-14 (submissible case does not require mathematical certainty as to loss of goodwill, but does require more than just a "gut" feeling).

## III. Conclusion

Accordingly, it is hereby ORDERED that Defendant Mike's Train House's Motion for Summary Judgment [Doc. # 161] is DENIED.

                s/ Nanette K. Laughrey
                NANETTE K. LAUGHREY
                United States District Judge

Dated: December 27, 2010
Jefferson City, Missouri